ETHEL H. HOGE, DIETRICH SCHMITZ AND HAMILTON C. ROLFE, EXECUTORS OF THE ESTATE OF JAMES D. HOGE, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58118, 58119.   Promulgated December 13, 1935.

*Lowell P. Mickelwait, Esq.,* and *Elmer E. Todd, Esq.,* for the petitioners.
*Elden McFarland, Esq.,* for the respondent.

OPINION.

McMAHON: Each of these proceedings involves decedent's tax liability for 1927. Two petitions were filed, one by the two executors of decedent's estate to whom the deficiency letter was addressed, and one by all three executors of decedent's estate. One of the three executors, George Donworth, having resigned, and Dietrich Schmitz having been appointed by the court to succeed him, the Board, upon motion of the petitioners and without objection from the respondent, ordered that the executor thus appointed be substituted for his predecessor. The proceedings were consolidated for hearing and disposition.

The deficiency asserted amounts to $18,707.57. The issues presented are, first, whether respondent erred in setting aside a closing agreement, and, second, whether he erred in increasing petitioner's income for 1927 in the sum of $96,390, representing the redemption of certain preferred stock. The grounds for setting aside the closing agreement, as alleged by respondent, are decedent's willful failure and neglect to disclose the receipt of $96,390 of dividends during 1927 as distributions from the American Encaustic Tiling Co., tnat such distributions were essentially equivalent to taxable dividends, and that failure to disclose the receipt thereof constituted misrepresentation of a material fact which justified respondent in setting aside the closing agreement and asserting the deficiency here in question.

The stipulations, oral testimony, and documentary evidence disclose the following facts:

James D. Hoge signed and verified his income tax return for 1927 on March 9, 1928, reporting thereon a net income of $63,463.63. His return was prepared from his personal books of account and

records by his secretary and a public accountant experienced in income tax matters. In preparing his return, Hoge's secretary and the accountant discussed an entry of $42,840 appearing on his books, but did not include the amount in the return because they understood it was a return of capital from stock inherited by Hoge in 1917, his secretary having been so informed by him. Hoge instructed his secretary to be sure to put everything in his return; and he instructed his accountant to make his returns correctly.

In September 1928 one of respondent's auditors visited Hoge's office, talked with him, and, after being by him referred to his secretary, examined to some extent his books and records relative to his 1927 tax return. Hoge's books and records were placed before the auditor, who was assisted in the examination by the decedent's secretary, who was also his bookkeeper. As a result of this examination respondent made several adjustments in Hoge's 1927 return, particularly with respect to a $500 profit realized on the sale of shares of Proctor & Gamble corporate stock, and determined a deficiency of $84.43, which was duly paid.

Immediately following such examination respondent and Hoge entered into a formal closing agreement pursuant to section 606 of the Revenue Act of 1928, wherein it was agreed that Hoge's tax liability for 1927 was fixed and determined to be $7,200.19. Hoge executed the closing agreement—Exhibit 2, which is incorporated herein by reference—on September 13, 1928, and the respondent executed it on November 21, 1928. The respondent's action was approved by the Secretary of the Treasury on November 21, 1928.

In 1926 a medical clinic found that Hoge was suffering from cirrhosis of the liver, which was continually poisoning his system. His physical condition became progressively worse as auto-intoxication increased. He was confined to a hospital a number of times in 1927 and in 1928, and made trips abroad in both years for his health. For two or three years prior to his death he was under the care of a nurse, and for practically all of the last year of his life he was confined to his bed. He paid very little attention to the details of his business during the last two or three years of his life. Hoge died November 25, 1929.

Investigations by respondent's auditors of decedent's tax liability subsequent to 1927 disclosed certain facts affecting his 1927 tax liability. Thereupon the respondent, with the approval of the Secretary of the Treasury, set aside the closing agreement with respect to decedent's 1927 tax liability and asserted the deficiency herein against the petitioners as executors of Hoge's estate. The basis for this action by respondent is essentially as follows: In 1917 the decedent inherited from his uncle 1,050 shares of the common stock of the

American Encaustic Tiling Co., an Ohio corporation having at that time an authorized capital stock of 15,000 shares of common stock, par value $100 each. Stock dividends in 1922 and in the early part of 1927 increased decedent's holdings from such 1,050 shares of common to 6,125 shares of no par value common and 1,225 shares of $100 par value preferred stock, the preferred stock being acquired in 1927. After these changes in its capitalization the American Encaustic Tiling Co. had 18,000 shares of preferred stock authorized, with 17,594 shares outstanding, and 126,000 shares of common stock authorized, with 87,970 shares outstanding.

In May 1927 the American Encaustic Tiling Co. sold 20,000 shares of its authorized but unissued no par value common stock, receiving therefor the sum of approximately $620,000. As of June 30, 1927, the American Encaustic Tiling Co. used the proceeds of the aforesaid sale for the redemption of 5,866 shares of its preferred stock, a pro rata amount being redeemed from each stockholder, with the result that 408 shares of preferred stock owned by the decedent were redeemed, and on account thereof he received the sum of $42,840, or $105 per share.

The decedent informed his secretary about the receipt of the $42,840 from the American Encaustic Tiling Co. and she made the following entries in his personal books of account: Cash book, p. 14, under date of June 30, 1927, "Stocks 408 shares A. E. Tile Co. called—$42,840"; in an account in decedent's general ledger entitled "American Encaustic Tiling Co." a credit entry "June —, 1927, 408 shares preferred—$42,840"; in another account in decedent's general ledger entitled "Stocks (Control Account)" a credit entry "June 30, 1927, 408 Sh. A. E. Tile Pfd.—$42,840"; in decedent's duplicate deposit book, a deposit slip dated June 30, 1927, showing a deposit of $42,840 with the explanation "408 sh. A. E. Tile at 105 (called)"; in decedent's check stub account with the Dexter Horton National Bank, a deposit entry on check stub #2452 dated June 30, 1927, for $42,840.

Thereafter, as of October 1 and December 31, 1927, the American Encaustic Tiling Co. made further redemptions of its preferred stock to the extent of 7,318 shares. As a result thereof 510 shares of preferred stock owned by the decedent were redeemed and he received $21,420 therefrom in October 1927 and $32,130 therefrom in December 1927, making $53,550 on these two redemptions, and a total of $96,390 on the three redemptions.

The decedent personally deposited the funds received in October with his brokers in New York City, A. M. Kidder & Co., and personally deposited the funds received in December in his personal account with the Corn Exchange Bank in New York City. The decedent's secretary had no knowledge of these latter redemptions and made no entries with respect thereto in decedent's books of

account. The decedent's accountant had no knowledge of such redemptions.

On June 30, October 1, and December 31, 1927, the American Encaustic Tiling Co. had on hand earnings or profits accumulated after February 28, 1913, in excess of the amounts distributed in redemption of its preferred stock.

At the time respondent's auditor examined decedent's books in September 1928 relative to his 1927 tax liability, the entries in decedent's books and records regarding the $42,840 redemption hereinabove set forth were available and open to her, but were overlooked or ignored by her. No other disclosure of the redemption was made by decedent's secretary to respondent's auditor. The decedent considered the redemption a return of capital, and so informed his secretary who, in turn, informed his accountant when the decedent's 1927 return was being prepared.

Two issues are presented by the foregoing facts, which we find, and such issues are, first, whether respondent is justified in setting aside a formal closing agreement executed under section 606 of the Revenue Act of 1928 [1] because decedent willfully misrepresented a material fact by failing to include $96,390 in his tax return and by failing to disclose the receipt thereof prior to the execution of the closing agreement; and, second, whether the $96,390 received by decedent from the American Encaustic Tiling Co. during 1927 is taxable as income.

The statute provides that, where the taxpayer and the respondent have entered into a closing agreement, this determination " shall be final and conclusive ", and the case shall not be reopened or the determination annulled, modified, set aside, or disregarded except upon a showing of fraud or malfeasance, or misrepresentation of a material fact. In his amended answers respondent has alleged that decedent willfully failed and neglected to disclose the receipt of this $96,390 and that such failure constituted a misrepresentation of a material fact within the meaning of section 606, *supra*. The

---

[1] SEC. 606. CLOSING AGREEMENTS.

(a) *Authorization.*—The Commissioner (or any officer or employee of the Bureau of Internal Revenue, including the field service, authorized in writing by the Commissioner) is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal-revenue tax for any taxable period ending prior to the date of the agreement.

(b) *Finality of agreements.*—If such agreement is approved by the Secretary, or the Undersecretary, within such time as may be stated in such agreement, or later agreed to, such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) The case shall not be reopened as to the matters agreed upon or the agreement modified, by any officer, employee, or agent of the United States, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.

\* \* \* \* \* \* \*

burden of proof rests upon the respondent to show by convincing evidence that decedent misrepresented a material fact. *Holmes & Janes, Inc.*, 30 B. T. A. 74, 79.

The parties have stipulated many of the facts. Other facts were testified to at the hearing that were not disputed. But two witnesses, one called by each party, differ somewhat in their recollections of the details pertaining to respondent's examination in September 1928 of decedent's books and records for 1927, which, comparatively, were not complex or extensive. Respondent's auditor testified that she merely verified separate items on the return, that while decedent's books were available for inspection she made no detailed examination thereof, that she questioned decedent's secretary as to items on the return, that her attention was drawn to the $500 profit on Proctor & Gamble corporate stock that was not reported on decedent's return, that she concluded her examination and made her report upon the basis of a one-half day's examination, and that she did not know of nor was she informed of any redemption of decedent's preferred stock in the American Encaustic Tiling Co.

The decedent's secretary testified that respondent's auditor consumed two or three days in her investigation; that decedent's deposit book, check stub book, cash book and general ledger (which constitute all of his books of account) were placed on a desk for the auditor's use; that as far as she knew respondent's auditor examined the books thoroughly; that she was asked for and gave information to respondent's auditor; that respondent's auditor went through the ledger, which at the time of the examination had entries in two accounts relating to the redemption of preferred stock; that in preparing Hoge's return for 1927 she and the public accountant used his books and records and discussed the item of $42,840; that she was told by Hoge that the $42,840 was a return of capital upon corporate stock which he had inherited from his uncle and she so informed Hoge's accountant; that she had no knowledge of the redemptions on October 1 and December 31, 1927, and that she made no effort to determine whether decedent realized a gain on the redemption. A comparison of the testimony of one with that of the other discloses no serious conflict sufficient to be determinative of these proceedings.

The examination was, at decedent's request, made at the office of decedent where his books of account and also other records were kept and readily produced.

Hoge's accountant testified that he was a deputy collector and field auditor for the Federal Bureau of Internal Revenue from 1909 to 1918; that he was employed by decedent in income tax matters and instructed to make out the latter's returns correctly; that he prepared decedent's return for 1927 with the assistance of decedent's

secretary, using Hoge's personal books and records; that he and the secretary discussed the $42,840 received by decedent upon redemption of the American Encaustic Tiling Co. preferred stock; that he was informed by the secretary that this amount was a return of capital by redemption of inherited stock; that he thought it was a nontax-able item and therefore, through an oversight, he did not include it in the return; that had he realized the importance of it he would have reported the redemption of the preferred stock; and that it was not impressed on his mind that the redemption might have resulted in a profit.

We are satisfied from the record that there was a failure to disclose on decedent's return all the facts relative to his 1927 gross income. This is not equivalent, however, to holding that decedent misrepresented the facts as to his 1927 income willfully or otherwise. There was no act of commission looking toward concealment and no positive act or word indicating intentional misrepresentation, and no such acts or words have been alleged or established by respondent. The only act which respondent urges as constituting misrepresentation is the failure to disclose. Under all the facts and circumstances of these proceedings, some more positive or deliberate act of misrepresentation is required to justify setting aside the closing agreement. See *Thomas J. Ingram*, 32 B. T. A. 1063. In that case the Board stated as follows:

\* \* \* But the respondent argues that this still leaves the omission in the return and the nondisclosure at the time of the closing agreement within the statutory term of " misrepresentation of a material fact." His argument would treat misrepresentation as synonymous with mistake. While there is a subtle question of language in the distinction between a mistake or erroneous statement and a misrepresentation, this must be resolved to promote the purpose of the statute. Obviously the use of the word misrepresentation denotes something more deliberate or more conscious than mere error or mistake. Otherwise the entire rationale of a closing agreement would be lost. Congress intended that innocent mistakes should be buried in a closing agreement. \* \* \*

Furthermore, we have here some proof which negatives a holding of willful misrepresentation. It is undisputed that decedent's books and records contain entries showing the receipt of the first redemption of $42,840. Had there been an intent to conceal or misrepresent the facts, we doubt that these entries would have been made. We also have proof to the effect that decedent, his secretary and his accountant considered the $42,840 a return of capital. That they or any of them were mistaken in this respect does not establish willful misrepresentation. Mistakes of fact or law are insufficient grounds to set aside the finality which the statutes give the closing agreement. *Wolverine Petroleum Corporation* v. *Commissioner*,

75 Fed. (2d) 593, affirming *Wolverine Petroleum Corporation*, 29 B. T. A. 1236. There the court stated:

The purpose of the statute authorizing closing agreements is to enable the taxpayer and the government finally and completely to settle all controversies in respect of the tax liability for any previous taxable period, and to protect the taxpayer against the reopening of the matter at a later date, and to prevent the filing of additional claims for refund or the institution of suit for the same purpose by the taxpayer. *Perry* v. *Page* (CCA 1) 67 F. (2d) 635; *Hering* v. *Tait* (CCA 4) 65 F. (2d) 703; *Bankers' Reserve Life Co.* v. *United States* (Ct. Cl.) 42 F. (2d) 313; *Aetna Life Ins. Co.* v. *Eaton* (CCA 2) 43 F. (2d) 711; *Parish & Bingham Corp.* v. *United States*, (Ct. Cl.) 44 F. (2d) 993.

\*      \*      \*      \*      \*      \*      \*

The statute excludes mistakes of fact as well as of law as grounds for the rescission of closing agreements. Only fraud, malfeasance, or misrepresentation are mentioned as bases for attacking them. In recognition of their conclusive character on all matters agreed upon, it has been held that, where the tax covered by the agreement has been assessed under a section of the Revenue Act later declared to be unconstitutional, the closing agreement, nevertheless, was binding and conclusive upon the parties. [Citing cases.]

Furthermore, two credible, intelligent, disinterested witnesses testified unqualifiedly that his reputation for honesty, integrity and fair dealing was good; his widow testified that he was conscientious in making his tax returns; and, as heretofore stated, his secretary and accountant testified to decedent's insistence on making full and correct returns of his income for 1927.

Too, respondent had made an examination of decedent's books and records prior to the execution of the closing agreement. He would now set aside his own act in determining decedent's tax liability at $7,200.19, despite the fact that he had ample opportunity to catch the discrepancy as to the item of $42,840. The undisputed proof shows that the sale of the Proctor & Gamble corporate stock, which the auditor discovered, was recorded in decedent's books with and in the same manner as the item of $42,840. It would be error to say that respondent relied on decedent's return wholly to his detriment, since his examination resulted in an increase in decedent's tax liability for 1927, which was paid. We can not but feel that in this proceeding respondent relied to a considerable extent, at least, upon the results of his own examination rather than altogether on decedent's return as filed.

While each proceeding involving willful misrepresentation must turn from necessity upon its own particular facts, there are analogous cases which are persuasive as to the conclusion which should be reached. In *Phoenix Insurance Co.*, 29 B. T. A. 291, the Board held that the petitioner unintentionally neglected to eliminate all Federal income taxes from the amount of taxes deducted on its return, but that no misrepresentation occurred sufficient to justify setting aside a closing agreement under section 606. In the *Phoenix* case there

was no field examination of the taxpayer's books, such as occurred in the instant proceedings before the closing agreement was executed.

We think it is well established by applicable precedents that a valid and binding closing agreement can not be set aside by either party except upon clear and convincing proof that fraud, malfeasance or misrepresentation is present; and, since the evidence herein fails to convince us that decedent has misrepresented, willfully or otherwise, material facts sufficient to set aside the closing agreement, we must sustain the finality and conclusiveness of that agreement, there being no other claim or showing of fraud and there being none whatever of malfeasance.

In view of this disposition of the first issue, it is unnecessary to decide the second issue.

*Decision will be entered for the petitioner.*